IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHANTE LASHON WEIR, | ) | CASE NO. 5:21cv1117 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Chante Lashon Weir ("Plaintiff" or "Ms. Weir") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter

has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

## I.  Procedural History

On May 20, 2019, Ms. Weir filed an application for DIB (Tr. 54), and on October 17,

2019 she filed a claim for SSI (Tr. 84).  She alleged a disability onset date of November 15,

2017.  (Tr. 55.)  She alleged disability due to multiple sclerosis ("MS"), meralgia paresthetica,

severe muscle spasms legs, blurring vision, rheumatoid arthritis, severe hypertension, severe

1

back pain, and severe fatigue.  (Tr. 54.)  Ms. Weir's application was denied at the initial level

(Tr. 66) and upon reconsideration (Tr. 82, 97), and she requested a hearing (Tr. 133).  On July

15, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 27-53.)

On September 1, 2020, the ALJ issued a decision finding that Ms. Weir had not been

under a disability within the meaning of the Social Security Act from November 15, 2017

through the date of the decision.  (Tr. 21-22.)  On April 13, 2021, the Appeals Council denied

Ms. Weir's request for review, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-3.)

On June 3, 2021, Ms. Weir filed a Complaint challenging the Commissioner's final

decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 9, 11-1,

12.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Weir was born in 1973 and was 44 years old on the alleged disability onset date,

making her a younger individual under Social Security regulations on the alleged onset date.

(Tr. 20.)  She had at least a high school education.  (*Id*.)  Ms. Weir had not worked since

November 15, 2017, the alleged onset date.  (Tr. 14.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

On November 6, 2017, Ms. Weir sought care from her primary care physician, Dr. Steve

Nam, for a rheumatoid arthritis flare in her hands.  (Tr. 549.)  She reported being unable to work

since October 21, 2017 because she could not open and close her hands.  (*Id*.)  She reported

seeing red nodules on her finger joints, although Dr. Nam noted no rashes, lesions, or areas of

discoloration on examination.  (Tr. 549-50.)  Dr. Nam did note obesity, but otherwise normal findings on examination, including normal mood and appropriate affect.  (Tr. 550.)  Ms. Weir had previously been taking Celebrex as needed for pain.  (Tr. 549.)  Dr. Nam continued Celebrex, added methotrexate and folic acid to manage her arthritis, and advised her to return in ten weeks.  (Tr. 551.)

Ms. Weir returned to Dr. Nam on December 5, 2017, reporting ongoing pain in her hands and feet with "not … much of a difference" since adding methotrexate.  (Tr. 552.)  She reported that she returned to work for three days, but had to stop because she could not walk due to pain in her feet, and still could not fully open her left hand.  (*Id*.)  She reported that she had not yet been contacted to schedule an appointment with a rheumatologist.  (*Id*.)  On examination, Dr. Nam noted her hand was very tender to palpitation, with swelling and erythema, and that she was unable to fully open it due to pain.  (Tr. 554.)  He also noted she walked with normal gait and could stand without any difficulty.  (*Id*.)  He continued her medications, referred her to rheumatology, advised her to return in one month, and estimated she would be able to return to work around January 16, 2018 or sooner if her symptoms improved.  (Tr. 555.)

Ms. Weir returned to Dr. Nam on January 26, 2018, continuing to complain of pain, described as a six out of ten and primarily in the left hand.  (Tr. 582.)  She reported that she had been dropping things with her dominant left hand and could not make a full fist with that hand. (*Id*.)  Rheumatology still had not contacted her to schedule an appointment.  (*Id*.)  On examination, Dr. Nam noted that her left hand was tender to palpitation, with reduced range of motion and left-hand grip.  (Tr.  584.)  She requested a note for time off work, and he granted her one more week while also increasing her methotrexate to better control her pain.  (Tr. 582, 585.) He advised her to return in two months.  (Tr. 585.)

At a February 16, 2018 primary care visit with Dr. Nam, Ms. Weir reported she had an appointment scheduled with rheumatology at the end of March.  (Tr. 578.)  She also reported going back to work for one day, but experiencing so much pain in her hands and feet that she could not continue.  (*Id*.)  On examination, both hands were tender to palpitation and her left hand showed edema, restricted range of motion, joint pain, and 4/5 grip strength.  (Tr. 580.)  However, the strength and range of motion in her right hand and arm was normal, and she continued to exhibit a normal gait and stand without difficulty.  (*Id*.)  Dr. Nam provided her with a work excuse until March 22, 2018 and advised her to follow up with rheumatology as scheduled.  (Tr. 581.)

Ms. Weir was evaluated by Dr. Joyce Williams at the Arthritis Clinic of Stark County ("ACSC") on March 15, 2018 for possible rheumatoid arthritis.  (Tr. 319.)  She reported a prior diagnosis of rheumatoid arthritis and recently dropping things with her dominant left hand due to "a combination of pain and decreased grip."  (*Id*.)  On examination, her deep tendon reflexes, sensation, coordination, and gait were all intact.  (Tr. 320.)  There was some subtle, chronic appearing synovitis on some of the fingers of her left hand and tenderness of both hands, but otherwise examination of the arms and wrists was unremarkable.  (Tr. 320, 321.)  There were bilateral bunions, multiple areas of tenderness to palpitation of the legs, and she complained of pain in the shoulders with movement, but her joints had no laxity and range of motion was full in her arms and legs.  (Tr. 321.)  Muscle strength in her arms and legs, and grip strength in her hands, was intact.  (*Id*.)  Dr. Williams diagnosed rheumatoid arthritis without rheumatoid factor, ordered imaging and blood work to assess whether a higher dosage of methotrexate was appropriate, and recommended a trial of naproxen until results were available.  (*Id*.)

4

On March 26, 2018, Ms. Weir returned to Dr. Nam for treatment of joint pain and reported she was experiencing numbness and tingling in her upper right thigh that progressed to burning pain in both legs.  (Tr. 593.)  On examination, findings were normal for both lower extremities, and she walked normally with no difficulty standing.  (Tr. 595.)

On April 3, 2018, Dr. Ned Nafziger at NeuroCare Center ("NeuroCare") noted Ms. Weir had a normal EMG of the bilateral lower extremities, and that sensory and motor conduction studies of her bilateral lower extremities were well within normal limits.  (Tr. 258.)  A brain MRI the following day indicated white matter disease which might be related to MS.  (Tr. 288.)  X-ray imaging taken April 17, 2018 showed moderate degeneration in the left foot, but normal findings in the right foot and both hands.  (Tr. 323-26).

Ms. Weir returned to Dr. Williams at ACSC on April 19, 2018, reporting not much improvement with methotrexate.  (Tr. 315.)  Her examination was unchanged and Dr. Williams interpreted the hand and foot x-rays as normal with no erosions.  (Tr. 316.)  She increased Ms. Weir's dosage of methotrexate, initiated a trial of Medrol Dosepak, recommended evaluation for carpal tunnel in her left hand, and advised her to return in one month.  (Tr. 317-18.)

Ms. Weir saw Dr. Nam for a primary care visit on May 8, 2018, and he noted that her brain MRI showed white matter disease suggesting a possible diagnosis of Multiple Sclerosis. (Tr. 606.)  She reported continued pain and swelling in both hands.  (*Id*.)  On examination, Dr. Nam noted edema in both hands, with normal gait and station.  (Tr. 608.)  He referred her to a neurologist, prescribed tramadol, and advised her to return in three months.  (*Id*.)

Ms. Weir returned to Dr. Williams at ACSC on May 21, 2018, reporting that the increased dose of methotrexate had noticeably reduced her pain.  (Tr. 311.)  Examination of the hands showed some chronic appearing synovitis, but no tenderness of the hands, wrists, ankles or

knees, and her gait remained intact.  (Tr. 312.)  Dr. Williams continued her medications and advised her to return in three months.  (Tr. 313.)

Ms. Weir returned to NeuroCare on July 16, 2018, reporting numbness and tingling in her legs and feet, dizziness, and recent vision symptoms including diminution in sight and blurring. (Tr. 280.)  On examination, Dr. Jay Berke noted normal muscle strength and tone, normal sensation, normal gait, and normal station.  (Tr. 282.)  He ordered MRIs of Ms. Weir's cervical and lumbar spine and a visual evoked potential test.  (Tr. 283.)

On July 31, 2018, Ms. Weir's cervical MRI revealed degenerative changes and significant medial deviation of the internal carotid arteries.  (Tr. 285.)  Her lumbar MRI demonstrated left foraminal protrusion at L2/3 resulting in moderate to severe left foraminal effacement and impingement of the exiting left L2 nerve root.  (Tr. 287.)  On August 8, 2018, NeuroCare physician Jennifer Drake noted Ms. Weir had a normal visual evoked response study. (Tr. 259.)

Ms. Weir returned to Dr. Nam on August 9, 2018, reporting worsening symptoms that included blurred vision, increased paresthesia, and new bilateral ankle swelling.  (Tr. 621.)  On examination, findings were in the normal range.  (Tr. 622.)  Dr. Nam continued her medications and advised her to return in ten weeks.  (Tr. 623.)

On August 27, 2018, Ms. Weir returned to NeuroCare.  (Tr. 275.)  Examination results were in the normal range, including normal gait and station.  (Tr. 277.)  Dr. Berke ordered a diagnostic lumbar puncture.  (Tr. 279.)  The following month, Dr. Berke noted that the lumbar puncture was positive for oligoclonal banding with a marked increase in IgG synthesis rate, and Ms. Weir was started on Copaxone.  (Tr. 270.)  Again, examination results were in the normal range, including normal gait and station.  (Tr. 272.)

On September 6, 2018, Ms. Weir returned to Dr. Nam for a follow up regarding abnormal lab results, which showed low vitamin D, B12 deficiency, and LFT elevation. (Tr. 618.) Physical examination results were in the normal range, except for obesity. (Tr. 619.) Dr. Nam ordered additional testing and prescribed vitamin D and B12 supplements. (Tr. 620.)

Ms. Weir returned to ACSC on September 19, 2018, when Dr. Williams noted the higher dose of methotrexate had produced a "good response" with "good tolerance." (Tr. 307.) On examination, her left finger showed subtle chronic appearing synovitis, but no tenderness of the hands, wrists, ankles or knees on palpation, and her gait remained intact. (Tr. 308-09.) Dr. Williams continued Ms. Weir's medications and advised her to return in three months. (Tr. 309.)

Dr. Nam saw Ms. Weir for her annual examination on October 19, 2018, when she reported fatigue, reflux, tingling or numbness, and joint and muscle pain. (Tr. 330-31.) Ms. Weir was frustrated with the process that led to her recent Multiple Sclerosis diagnosis and had been unable to begin Copaxone because insurance had not yet approved it. (Tr. 330.) Examination results were unchanged. (Tr. 332.) She was encouraged to improve her diet, "engage in regular aerobic exercise as tolerated," and return in eight weeks. (Tr. 333.)

On December 17, 2018, Ms. Weir reported to Dr. Nam that she had just stared Copaxone and thought she was experiencing dizziness as a side effect. (Tr. 334.) She also reported severe pain and burning in her left arm. (*Id*.) Examination results were largely unremarkable. (Tr. 335.) Dr. Nam continued tramadol and ordered additional blood testing. (Tr. 335-36.)

At her December 21, 2018 NeuroCare appointment, Ms. Weir reported intermittent muscle spasms during the day. (Tr. 265.) Examination results were normal, including normal gait and station. (Tr. 267.) Dr. Berke continued her medications and advised her to return in four months. (*Id*.)

At a March 15, 2019 primary care visit with Dr. Nam, Ms. Weir reported improvement in her left arm pain, but continued muscle spasms and burning in her legs that was keeping her up at night.  (Tr. 339.)  On examination, Dr. Nam noted obesity, normal gait, and "able to stand without difficulty."  (Tr. 340.)  He prescribed baclofen, continued tramadol, and advised her to return in four months.  (Tr. 341.)

Ms. Weir returned to NeuroCare on June 3, 2019, reporting she was compliant with her Copaxone but had worsening burning and tingling in her feet, and intermittent spasms.  (Tr. 260.)  She also reported fatigue, vision changes, dizziness, extremity weakness, gait disturbance, numbness in extremity, muscle weakness, and muscle pain.  (Tr. 261.)  On examination, Dr. Berke noted full motor strength and normal tone, but an insecure gait and station.  (Tr. 262.)  He increased her dosage of baclofen, added gabapentin, and advised her to return in three months. (*Id.*)

On July 16, 2019, Ms. Weir reported to Dr. Nam that she had greater difficulty with leg pain and weakness, and problems with balance that lead to six falls since her last visit.  (Tr. 357.)  Examination, Dr. Nam made no musculoskeletal findings.  (Tr. 358.)  He continued her medications, increased her gabapentin, and advised her to "engage in regular exercise as tolerated," "[c]ontinue excellent weight loss efforts through diet and exercise," and return in four months.  (Tr. 359-60.)

At her October 8, 2019 NeuroCare appointment, Ms. Weir reported gabapentin was making her fatigued, and that she used a cane when out of the home but had no falls.  (Tr. 393.)  She also reported extremity weakness, gait disturbance, numbness in extremity, back pain, joint pain, muscle weakness, and muscle pain.  (Tr. 394.)  On examination, Dr. Berke noted full motor strength, normal tone, insecure gait and station, and that she could not tandem walk.  (Tr. 395.)

He continued her medications, substituted Lyrica for gabapentin, and advised her to return in six months.  (Tr. 396.)

On February 10, 2020, Dr. Damien Earl took over as Ms. Weir's NeuroCare provider. (Tr. 467-71.)  Dr. Earl noted that Ms. Weir had been on gabapentin for paresthesias, but switched to Lyrica at her October 2019 visit because gabapentin was not effective.  (Tr. 467.)  She was using a cane with "[s]ome occasional unsteadiness" and "minor falls," as recent as 1.5 weeks prior.  (*Id*.)  On examination, Ms. Weir was steady with a cane, with full motor strength and normal tone.  (Tr. 469.)  Dr. Earl continued her medications and advised her to return in six months.  (Tr. 470.)

On April 16, 2020, Ms. Weir reported to Dr. Nam that she was feeling well with no new complaints.  (Tr. 474.)  Examination findings were unchanged.  (Tr. 476.)  Dr. Nam continued her medications and encouraged her to improve her diet, engage in regular aerobic exercise five days per week, sleep seven to eight hours a night, and return in six months.  (Tr. 477-78.)

### 2.    Opinion Evidence

#### i.    Consultative Examination

On August 14, 2019, Bryan J. Krabbe, Psy.D. conducted a consultative psychological examination of Ms. Weir.  (Tr. 387-92.)  She reported a family history of mental illness but no history of psychotherapy or psychoactive medications.  (Tr. 389.)  She described symptoms of anxiety that included restlessness, fatigue, difficulty concentrating, irritability, muscle tension, and sleep disturbance, which could result in a decrease in attention and concentration.  (Tr. 391-92.)  On examination, she appeared to have adequate energy, but moved at a slow rate of speed with a cane.  (Tr. 389.)  Mental status examination results were in the normal range, except for difficulty completing the serial sevens task, which assessed attention and focus.  (Tr. 390.)  She

did not describe significant problems in responding appropriately to supervision or coworkers in a work setting, and Dr. Krabbe observed she "interacted appropriately and was pleasant during the evaluation."  (Tr. 392.)  He opined that she had "some difficulty with attention and focus," but did not identify any other mental functional limitations.  (Tr. 391-92.)

> ### ii.      Function Reports

Ms. Weir completed a Function Report in June 2019.  (Tr. 210-19.)  She reported that MS symptoms limited her ability to work due to muscle spasms, burning pins and needle sensations in her arms and legs, muscle weakness in her arms legs and feet, and blurred vision.  (Tr. 210.) She reported that she could not walk without assistance and had difficulty sitting, standing, walking, and opening things.  (*Id*.)  She was unable to grab things, frequently dropped things, got dizzy, and fell.  (Tr. 210, 217.)  She noted that she lived with her mother and her 13-year-old cousin, that she had legal guardianship of her cousin, but that her mother paid for her cousin's food and clothes and helped care for him.  (Tr. 211, 217.)

Her mother reportedly helped her dress, bathe, and care for her hair.  (Tr. 211.)  Her mother, cousin, and nieces also helped buy and prepare food and care for her dogs.  (*Id*.)  Ms. Weir reported she needed help with personal care, but was able to microwave frozen dinners, make sandwiches with assistance, and wash dishes while sitting if she took breaks.  (Tr. 212.) She indicated she did not drive due to weakness and painful spasms in her legs and blurry vision. (Tr. 213.)  She only left the house to visit the doctor, and shopped online when she had money. (*Id*.)  She reported that her hobbies included reading, watching television, and listening to music, but that her ability to do these things was limited by pain and blurry vision.  (Tr. 214.)  She indicated that she could not bend or squat due to back pain, and could lift no more than twenty pounds.  (Tr. 215.)  She reported her concentration, attention, and ability to follow instructions

was limited by pain.  (Tr. 215-16.)  She could stand no more than twenty minutes and sit no more than thirty minutes due to back and leg pain.  (Tr. 216.)  She explained that her doctor advised her to use a cane, and that she used her father's cane to walk.  (Tr. 218.)

     **iii.**      **State Agency Reviewers**

On July 18, 2019, state agency reviewing physician Elaine Lewis, M.D. reviewed the record and opined that Ms. Weir was limited to the light level of exertion with the following additional functional limitations:

- never climb ladders, ropes, or scaffolds;

- occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl;

- frequently finger and feel;

- avoid concentrated exposure to extreme heat or cold, fumes, odors, dusts, gases and poor ventilation;

- avoid even moderate exposure to vibration; and

- avoid all exposure to hazards such as machinery and heights (Tr. 60-63).

On December 21, 2019, state agency reviewing physician Steve McKee, reviewed the record and concurred with the opinion of Dr. Lewis.  (Tr. 77-79, 92-94.)

On September 6, 2019, state agency reviewing psychologist Audrey Todd, Ph.D., reviewed the record and opined that Ms. Weir was moderately limited in the following areas:

- ability to maintain attention and concentration for extended periods,

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms,

- ability to perform at a consistent pace without an unreasonable number and length of rest periods, and

- ability to respond appropriately to changes in the work setting.

11

(Tr. 64-65.)  Dr. Todd opined Ms. Weir was limited to work in a setting with no high/rapid production demands or time deadlines, where changes were infrequent and easily explained. (*Id*.)  On December 19, 2019, state agency reviewing psychologist Paul Tangeman, Ph.D., reviewed the record and concurred with the opinion of Dr. Todd.  (Tr. 80-81.)

## C.      Hearing Testimony

### 1.      Plaintiff's Testimony

At the July 15, 2020 hearing, Ms. Weir testified that she lived with her mom and was unable to work due to muscle weakness, falling, dizziness, muscle spasms, and difficulty grabbing and holding things.  (Tr. 40-41, 45.)  She could walk five minutes at the most and lift no more than a gallon of milk.  (Tr. 42.)  She fell at least once a week, even with the use of a cane.  (Tr. 43.)  The cane was recommended by her primary care doctor and her neurologist.  (Tr. 44.)  Her legs always spasmed and burned.  (Tr. 44.)  Tremors in her hands came and went.  (*Id*.) She believed that her symptoms were getting worse.  (Tr. 41.)

On a typical day, she testified that she woke, stretched, showered, made breakfast, and then would watch television, read, or listen to music.  (Tr. 43.)  Sometimes she needed help dressing, especially with buttons, and her mom helped her.  (Tr. 45.)  Her mom also helped her with cooking.  (*Id*.)  She was able to bathe on her own and did not bother to do her hair.  (*Id*.)

With regard to prior work, she was a machine operator at Fresh Mark from 2011 to 2017. (Tr. 36.)  In that job, she had to lift 80 to 90 pound rolls of film to get the machine ready, and worked eight to ten hours a day.  (*Id*.)  Before that, she worked full time as a candy inspector and packager, lifting 30 to 40 pounds of boxes.  (Tr. 37, 40.)  Before that, she worked in childcare as a "parent partner" instructing preschoolers in their homes.  (Tr. 37-38.)  She lifted no more than 30 pounds in that job.  (Tr. 38.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 46-51.)  The VE testified that the hypothetical individual of Plaintiff's age, education and work experience and the function limitations described in the ALJ's RFC determination could not perform her prior work, but could perform representative positions in the national economy, including callout operator, document preparer, or nut sorter.  (Tr. 49-51.)  He also testified that if the person would either be off task 15% or absent more than two days a month, that would preclude competitive employment.  (Tr. 51.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his September 1, 2020 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.  (Tr. 14.)

2.      The claimant has not engaged in substantial gainful activity since November 15, 2017, the alleged onset date.  (*Id.*)

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, *et seq.*  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

3.  The claimant has the following severe impairments: Anxiety, Inflammatory Arthritis, Multiple Sclerosis, Degenerative Disc Disease, and Obesity.  (*Id.*)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15.)

5.  The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: The claimant is limited to frequent fingering and feeling with the bilateral upper extremities. She can climb ramps and stairs occasionally, but can never climb ladders, ropes, or scaffolds. She can balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally. The claimant can never work at unprotected heights, or around moving mechanical parts. She could occasionally be exposed to dust, odors, fumes, pulmonary irritants, extreme cold occasionally, extreme heat occasionally, and vibration. The claimant is able to perform simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work). She is able to make simple work-related decisions. (Tr. 16.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 20.)

7.  The claimant was born in 1973 and was 44 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.  The claimant has at least a high school education.  (*Id.*)

9.  Transferability of job skills is not material to the determination of disability.  (*Id.*)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including call out operator, document preparer, and nut sorter.  (Tr. 20-21.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from November 15, 2017, through the date of the decision on September 1, 2020.  (Tr. 21.)

## V. Plaintiff's Arguments

In her Brief, Ms. Weir asserts three assignments of error:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

2. The ALJ committed harmful error when he failed to find that Weir satisfied the criteria of a Listing at Step Three of the Sequential Evaluation. In the alternative, the ALJ's erred when his RFC failed to consider the effect of the combination of Weir's severe impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis.

3. The ALJ erred in that his evaluation of Weir's symptoms was in violation of Social Security Ruling 16-3p.  (ECF Doc. 9 p. 1.)

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to

16

any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **First Assignment of Error: Whether Plaintiff Has Standing to Challenge ALJ Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Plaintiff argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles. (ECF Doc. 9 pp. 8-10, ECF Doc. 12 pp. 2-9.) Specifically, she argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, ⸺ U.S. ⸺, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term than the President of the United States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*. (ECF Doc. 9 p. 8, ECF Doc. 12 p. 3.) Plaintiff argues based on this precedent that the ALJ's authority to issue the decision in this case was "constitutionally defective" because his authority was delegated from the Commissioner, and because the ALJ's decision was improperly based on regulations promulgated by the former Commissioner without authority. (ECF Doc. 9 p. 8, ECF Doc. 12 p. 4.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 11-1 p. 8 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Plaintiff is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused her harm." (ECF Doc. 11-1 p. 8 (citing *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).) More specifically, the Commissioner argues that Plaintiff cannot show harm to support her claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not

subject to the challenged removal restriction, and because Plaintiff cannot show that the removal restriction caused the denial of her benefits.  (ECF Doc. 11-1 p. 8.)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with numerous other courts that Plaintiff's constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Plaintiff lacks standing to assert the challenge.  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Catherine JSW v. Comm'r of Soc. Sec.*, No. 3:20-cv-5602 , 2021 WL 5276522, *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.")  Although the Commissioner did not directly challenge Plaintiff's standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt.  *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited."  *Virginia House of Delegates v. Bethune-Hill*, ––– U.S. –––, 139 S. Ct. 1945, 1951,

204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Plaintiff did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein.  (ECF Doc. 11-1 pp. 8-9.) *See also Rhouma*, --- F.Supp.3d ---, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Plaintiff must satisfy a three-pronged test to establish Article III standing, namely: "[she] must show that [she] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch NAACP v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets

and internal quotation marks omitted)).  However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void ab initio and must be undone."  141 S. Ct. at 1788, n.24.

As the party invoking federal jurisdiction in this case, Plaintiff bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 589 (2006).  Plaintiff argues that the requirements for standing are met because the Commissioner did not argue otherwise, and for the reasons set forth in two district court cases addressing similar constitutional challenges.  (ECF Doc. 12 p. 3 (citing *Brinkman v. Kijakazi*, No. 5:21-cv-076, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Plaintiff has successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* faced a similar challenge to an ALJ decision based on the alleged unconstitutionality of the statutory removal provision for the Commissioner of Social Security under *Seila Law*.  2021 WL 4462897, at *1.  However, contrary to the argument offered by Plaintiff in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. Because Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional challenge."  *Id*. at *2 (emphasis added).  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her

21

constitutional violation claim fails for lack of standing."  *Id*. (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S.Ct. at 1779).  This case clearly does not support a finding that Plaintiff has demonstrated standing to pursue her constitutional claim in this case.

In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3.  In so finding, the court relied in part on another court's observation that "[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate."  *Id*. (quoting *Tafoya v. Kijakazi*, No. 21-CV-00871, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)).  Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null." *Tafoya,* 2021 WL 3269640, at *5.

Consistent with the findings in *Sylvia* and *Tafoya*, Plaintiff asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 9 p. 8.)  In other words, she contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to him.  However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office."  141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there

22

was accordingly "no reason to regard any of the actions taken by the [agency] … as void." *Id*. at 1787 (emphasis in original).  In so finding, the Court distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.,* 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id*. at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether Plaintiff was "harmed by an action that was taken by [the SSA Commissioner] and that [she] alleges was void." *Collins*, 141 S. Ct. at 1788, n.24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Plaintiff asserts that the ALJ decided this case "based on regulations promulgated by the Commissioner when he had no authority to issue the same."  (ECF Doc. 9 p. 9.)  More specifically, she asserts that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015."  (ECF Doc. 12 p. 6.)

First, Plaintiff's arguments on this point are underdeveloped, as she has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Plaintiff must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected her.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and

individual way."). Second, even a cursory review of the actions of the former Commissioner identified by Plaintiff reflects that those actions are not traceable to harm asserted by Plaintiff in this case. As to the identified changes to HALLEX, an internal procedural manual for the Social Security Administration, the cited change pertains to the way that Office of Hearings Operations staff will respond when a notice of hearing acknowledgement is not returned. *See* HALLEX I-2-3-20. No challenge is raised in this case regarding deficiencies with the notices of hearing. As to the identified changes to the musculoskeletal listings, it is evident that the identified changes took effect on April 1, 2021, seven months after the ALJ's September 1, 2020 decision in this case (Tr. 22), and thus could not have impacted this decision. *See* DI 34121.013. Unlike the shareholders in *Collins*, whose injury – the loss of net worth in companies in which they owned shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of the formula to calculate dividends, here Plaintiff has not demonstrated that the regulatory changes she identifies impacted the denial of benefits. *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Plaintiff has failed to establish that she has suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge. *See, e.g., Rhouma*, 2021 WL 5882671 at *11 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to challenge the constitutionality of § 902(a)(3)."); *Catherine JSW*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin*, 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*,

24

2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Plaintiff does not have standing to proceed with her separation of powers constitutional claim, the undersigned recommends that the Court deny Plaintiff's request for a remand based on the asserted constitutional challenge.

**C.     Second Assignment of Error: Whether ALJ Erred by Finding Plaintiff Did Not Meet or Medically Equal a Listing at Step Three, or by Failing to Consider the Combined Effects of Plaintiff's Impairments**

Ms. Weir's first substantive assignment of error combines two distinct arguments.  First, she asserts that the ALJ erred by finding that she did not meet or medically equal a listing at Step Three.  (ECF Doc. 9 p. 10.)  Second, she asserts that the ALJ failed to consider the combined effect of her impairments in determining her RFC.  (*Id*.)  Each issue will be addressed below.

**1.     Whether ALJ Erred in Step Three Analysis**

Ms. Weir first asserts that the ALJ erred by finding that she did not meet or medically equal a listing at Step Three.  (ECF Doc. 9 p. 10.)  The Commissioner acknowledges that the ALJ should have analyzed the severity of Ms. Weir's impairments under Listings 1.04, 11.09, and 14.09 but asserts the error is harmless because "the record illustrated that she did not come close to fulfilling all of the criteria of any of these listings."  (ECF Doc. 11-1 p. 19.)

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a listing.  *See Johnson v. Colvin*, No. 1:13CV-00134, 2014 WL 1418142, at *3 (W.D. Ky.

25

Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  To do so, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

The Sixth Circuit has explained that "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)).  An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).  To raise a "substantial question," the Court explained "[a] claimant must do more than point to evidence on which the ALJ could have based his finding." *Id*. (citing *Sheeks*, 544 F. App'x at 641–42).  "[T]he claimant must point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Id*.  "Absent such evidence," the Sixth Circuit found that an ALJ "does not commit reversible error by failing to evaluate a listing at Step Three." *Id*. at 433.

In this case, the ALJ found Ms. Weir did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, observing that "[n]o treating or examining physician has indicated findings that would satisfy the severity of the requirements of any listed impairment." (Tr. 15.)  He explained that "[a]ll of the listings were considered in reaching this finding, with

26

specific emphasis on listings 1.02, 1.04, 11.09, 12.06, and 14.09." (*Id.*)  However, his only additional analysis in support of his findings at Step Three was limited to Listing 12.06.  (*Id.*)

Ms. Weir argues that the ALJ committed harmful error when he failed to find she satisfied the criteria of a listing at Step Three, specifically arguing that she met the criteria for Listings 1.04, 11.09, and 14.09.  (ECF Doc. 9 pp. 10-17.)  Under the "substantial question" standard above, in order to assess whether the ALJ committed reversible error in failing to substantively discuss those listings, the undersigned must consider whether Ms. Weir has supplied "specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of" Listings 1.04, 11.09, or 14.09.  *See Smith-Johnson*, 579 F. App'x at 432.

> ### i.  Whether Ms. Weir Identified Evidence Raising a "Substantial Question" as to Listing 1.04

Listing 1.04 relates to disorders of the spine resulting in nerve root compression.  At the time of the ALJ's decision, this Listing was defined as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

> With:

> A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

> or

> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

> or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

Ms. Weir asserts that she "had impairments relating to Listing 1.04 dealing with disorder of the spine with evidence of nerve root compression," without specifying whether her argument applies to Section A, B, or C of the Listing.  (ECF Doc. 9 pp. 14-15.)  She also fails to outline "specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of" any section of Listing 1.04.  *See Smith-Johnson*, 579 F. App'x at 432.  She simply cites to the following evidence, without articulating how it could support a finding that every element of any section was met or equaled: (1) a July 31, 2018 lumbar MRI demonstrating left foraminal protrusion at L2/3 resulting in moderate to severe left foraminal effacement and impingement of the exiting left L2 nerve root (*id.* at pp. 14-15 (citing Tr. 287); (2) a treatment record from July 16, 2019 documenting complaints of fatigue, muscular weakness, tingling or numbness, and loss of balance (*id.* at p. 15 (citing Tr. 358)); and (3) her reported inability "to ambulate effectively as she needed a cane" (*id.*).  Her only substantive argument is that her use of a cane amounted to an inability to "sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  (*Id.*)

Based on this limited evidence and argument, she contends the ALJ erred in finding she did not meet or equal a listing because the evidence "established that [she] satisfied the criteria of [the three] Listings … either singly or in combination."  (*Id.*)  Her analysis clearly fails to raise "'a substantial question as to whether [the claimant] could qualify as disabled'" under Listing 1.04.  *Smith-Johnson*, 579 F. App'x at 432.  Not only does she fail to articulate how the described evidence could support a finding that every element of the Listing was met or equaled,

but her only substantive reference (1.00B2b(2)) misconstrues the regulatory standard.  In arguing

that her use of a single-handed cane demonstrates an "inability to ambulate effectively" under

1.00B2b(2) (ECF Doc. 9 p. 15), she ignores clear language in the Listing which provides that

ineffective ambulation is defined as "having insufficient lower extremity functioning … to

permit independent ambulation without the use of a hand-held assistive device(s) that limits the

functioning of <u>both</u> upper extremities," such as "a walker, two crutches or <u>two</u> canes."  20 C.F.R.

Pt. 404, Subpart P, App. 1, § 1.00B2b(l), (2) (emphasis added).

Ms. Weir has failed to identify sufficient evidence to demonstrate that she could

reasonably meet or equal every requirement of Listing 1.04, and none that could support a

finding of "ineffective ambulation" under the regulatory definition of that term.  Indeed, the

objective medical evidence highlighted by the ALJ in his Step Four analysis is wholly

inconsistent with a finding of such limitations.  (*See, e.g.,* Tr. 17 (citing Tr. 262 (neurologist

observes full motor strength and normal tone, but insecure gait and station), Tr. 395 (neurologist

observes full motor strength, normal tone, insecure gait and station, and an inability to tandem

walk)), Tr. 469 (neurologist observes steady gait with cane, with full motor strength and normal

tone).)

The cases cited by Ms. Weir are inapposite.  In *Meyer v. Commissioner*, the court

specifically found "evidence in the record showing that Meyer had a neuro-anatomic distribution

of pain, limitation of motion of her lumbar spine, motor loss/weakness, sensory and reflex loss,

and positive straight-leg raise testing that could, potentially, evidence nerve root compression"

under Listing 1.04A.  *Meyer v. Comm'r of Soc. Sec.*, No. 3:20CV921, 2021 WL 1224063, at *9

(N.D. Ohio Apr. 1, 2021).  In *Bryson v. Commissioner*, the court outlined numerous specific

objective findings in the record as a whole that "d[id]n't appear to add up" with the ALJ's

29

statement at Step Three "that no evidence established the criteria of Listing 1.04." *Bryson v. Comm'r of Soc. Sec.,* No. 1:20-CV-1137, 2021 WL 2735993, at *13 (N.D. Ohio June 10, 2021), *report and recommendation adopted*, No. 1:20-CV-01137, 2021 WL 2720071 (N.D. Ohio July 1, 2021).  In *Harris v. Commissioner*, the court outlined specific imagery and objective findings in the record that could support a finding that the impairments met or equaled Listing 1.04, and additionally rejected the Commissioner's argument that an MRI demonstrating nerve root compression need not be considered because it was dated four days after the date last insured. *Harris v. Comm'r of Soc. Sec.*, No. 1:18-CV-01984, 2019 WL 4991641, at *10 (N.D. Ohio Oct. 8, 2019).  The analysis in each of these decisions specifically highlighted the ALJ's failure to address significant objective evidence that was relevant to the listings analysis.  No similar showing has been made by Ms. Weir in this case.

Because Ms. Weir has not identified specific record evidence demonstrating that she could have reasonably met or equaled every element of Listing 1.04, the undersigned finds the ALJ did not commit reversible error by failing to evaluate Listing 1.04 at Step Three.

### ii.    Whether Ms. Weir Identified Evidence Raising a "Substantial Question" as to Listing 11.09

Ms. Weir also argues that the ALJ erred by failing to discuss the basis for his determination that she did not meet or medically equal Listing 11.09, which deals with MS. (ECF Doc. 9 pp. 10-13.)  While she does not specify whether she is asserting that she satisfied the elements of Listing 11.09A or B, she describes only the criteria for Listing 11.09A.  (ECF Doc. 9 pp. 10-11.)  Listing 11.09A sets forth the following criteria:

11.09 Multiple Sclerosis, characterized by A or B:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

30

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.09.  Sections 11.00D1 and 11.00D2 further define

"disorganization of motor function," providing:

1. Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity.

All listings in this body system [with exceptions not pertinent here] include criteria for disorganization of motor function that results in an extreme limitation in your ability to:

a. Stand up from a seated position; or

b. Balance while standing or walking; or

c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).

2. Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).

a. Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes.

b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes.

c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

31

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00D (emphasis added).

Ms. Weir did outline specific record evidence relevant to this Listing, asserting that the evidence would establish that she "had disorganization of motor function in both lower extremities with an extreme limitation in her ability to balance while standing or walking and use of her upper extremities." (ECF Doc. 9 p. 11.) The evidence cited by Ms. Weir includes records supporting her use of a single-handed cane (*id.* at p. 11-12 (citing Tr. 43-44, 357, 358, 393, 395, 467, 469)), self-reports of difficulty with grasping and dropping things (*id.* (citing Tr. 42, 45, 311)), and self-reports of a variety of MS symptoms including intermittent spasms, fatigue, vision changes, dizziness, extremity weakness, gait disturbance, numbness in extremity, muscle weakness, and muscle pain (*id.* (citing Tr. 40, 260-61, 394)).

While the evidence cited by Ms. Weir may be relevant to the "disorganization of motor function" criteria set forth in Section 11.00D1, even a broad reading of the evidence cannot support a finding of "extreme limitations" as defined in Section 11.00D2. Like the "ineffective ambulation" standard under Listing 1.04, an extreme limitation with respect to "disorganization of motor function" in the lower extremities under Listing 11.09 refers to limitations in standing and walking that require the use of a walker, two crutches, or two canes. Ms. Weir's use of a single cane cannot support a finding of an "extreme limitation" in balance while standing or walking. None of the other treatment records cited by Ms. Weir remedy this deficiency. Indeed, as the ALJ specifically noted in his Step Four analysis, Ms. Weir's physical examinations repeatedly found she had full motor strength, normal muscle bulk and tone, and intact sensation and reflexes (Tr. 17 (citing Tr. 262, 395, 469).)

Ms. Weir also contends that the ALJ's observation that there were "no further records from [NeuroCare]" after February 2020 (Tr. 17) was "a prejudicial statement as the hearing was

in July 2020 and the most recent record is from February." (ECF Doc. pp. 12-13; *see also* ECF Doc. 12 p. 2.)  Ms. Weir's reasoning here is illogical.  She does not identify later neurological records that were overlooked by the ALJ, nor does she affirmatively assert that she received additional neurological care between February and July 2020.  Indeed, the office visit notes for her February 2020 neurology appointment reflect that she was advised to return in six months (Tr. 470), and her primary care physician observed in April 2020 that she was not scheduled to return to her neurologist until August 2020 (Tr. 474).  Given the lack of evidence to suggest the ALJ failed to consider more recent neurological treatment, or even that such treatment occurred, there is no grounds to conclude that the relevant observation was erroneous or prejudicial.

There is additionally no basis to conclude that the ALJ failed to properly develop the record with respect to Ms. Weir's neurological treatment.  While Ms. Weir's attorney requested that the ALJ hold the record open for a late-filed report from her primary care physician, he did not seek to hold the record open for outstanding neurology records.  (Tr. 30.)  Instead, he stated the ALJ could close the record upon receipt of the primary care record.  (Tr. 30-31.)  Where a claimant is represented by counsel, "the ALJ may ordinarily rely on counsel to present the claimant's case and to develop [her] claims." *Adams v. Comm'r of Soc. Sec.,* No. 1:15-CV-709, 2016 WL 2983737, at *6 (W.D. Mich. May 24, 2016) (citation omitted).  There is accordingly no grounds to conclude that the ALJ erred in observing that the record contained no NeuroCare records subsequent to the February 2020 office visit.

Because Ms. Weir has not identified specific record evidence demonstrating that she could have reasonably met or equaled every element of Listing 11.09A, the ALJ did not commit reversible error by failing to evaluate Listing 11.09 at Step Three.

### iii. Whether Ms. Weir Identified Evidence Raising a "Substantial Question" as to Listing 14.09

Similar to her arguments under Listings 1.04 and 11.09, Ms. Weir contends that the evidence supported a finding that she satisfied the criteria of Listing 14.09, which relates to inflammatory arthritis.  (ECF Doc. 9. p. 14.)  She does not identify which of four distinct subcategories she believes was met or equaled in this case, but does assert that the Listing "requires that the person have persistent inflammation or persistent deformity of one or more major peripheral joints in a lower extremity and documented medical need for a walker or bilateral canes and the inability to use one upper extremity."  (*Id*.)  This most closely mirrors Listing 14.09A1, which states:

A. Persistent inflammation or persistent deformity of:

1. One or more major peripheral joints in a lower extremity (see 14.00C8) and medical documentation of at least one of the following:

 a. A documented medical need (see 14.00C6) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or

 b. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 14.00C7), and a documented medical need (see 14.00C6) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09A1.

Despite reciting these requirements, Ms. Weir does not identify records documenting persistent inflammation or persistent deformity of one or more peripheral joints in a lower extremity.  Instead, as the ALJ noted in his Step Four analysis, rheumatology examinations from March through September 2018 reflected normal neurological functioning, intact gait, no rashes, with subtle chronic appearing synovitis in certain left finger joints, but with no tenderness to

34

palpation in the bilateral hands and normal imaging of hands and feet.  (Tr. 17 (citing Tr. 307-26); *see* Tr. 308-9, 312, 316, 320-21.)  Additionally, as noted in the prior sections, Ms. Weir has identified no evidence of record to suggest that she required the use of a walker, two crutches, or two canes.  Thus, she has failed to identify specific evidence to support a reasonable conclusion that she met or equaled the threshold requirements of Listing 14.09A.

She also argues that she "had involvement of two or more body systems as evidenced by her other severe impairments of anxiety, degenerative disk disease, and MS, with the neurological system involved to at least a moderate degree of severity due to her MS," and that she "had signs of severe fatigue and malaise."  (ECF Doc. 9 p. 14.)  This argument most closely mirrors Listing 14.09B, which states:

> B. Inflammation or deformity in one or more major joints of an upper or a lower extremity (see 14.00C8) with:
>
> 1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
>
> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09B.  Similar to the prior subsection, Ms. Weir does not identify any records that document inflammation or deformity in any major joints of an upper or lower extremity, and her rheumatology examination findings are limited to the observation of subtle chronic appearing synovitis of certain finger joints.  (Tr. 308-9, 312, 316, 320-21.)  Thus, she has failed to identify specific evidence to support a reasonable conclusion that she met or equaled the threshold requirements of Listing 14.09B.

Ms. Weir also asserts that the ALJ mischaracterized the record by stating "[t]here are no records of treatment at the Arthritis Clinic since September 2018."  (ECF Doc. 9 p. 14 (citing Tr. 17).)  This is clearly not a mischaracterization of the record.  While Ms. Weir identified a

"Continuity of Care Document" from her rheumatology provider that was dated June 25, 2019, the document itself is merely a summary that details prior treatment occurring between March and September 2018.  (Tr. 346-48.)  Thus, even the evidence highlighted by Ms. Weir supports the ALJ's observation that she received no further rheumatological care after September 2018. Certainly, Ms. Weir has not identified any records before the ALJ that would have supported a finding that she received treatment at ACSC after September 2018.

Because Ms. Weir has not identified specific record evidence demonstrating that she could have reasonably met or equaled every element of Listing 14.09, the ALJ did not commit reversible error by failing to evaluate this Listing at Step Three.

### 2.  Whether ALJ Erred in Considering Combined Effect of Impairments

The alternative argument Ms. Weir offers in her second assignment of error is that the ALJ erred when his RFC failed to consider the effects of her combination of impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis.  (ECF Doc. 9 p. 10.)  By its nature this is a Step Four argument, as it challenges the RFC.  However, the arguments in Ms. Weir's brief appear to vacillate between a Step Three and a Step Four analysis.

For example, in discussing Listing 14.09, Ms. Weir made the Step Three argument that the combination of her rheumatoid arthritis and MS made her "unable to ambulate effectively" while the neurological impact of her MS supported a finding that two or more body systems were involved in her rheumatoid arthritis.  (*Id.* at p. 14.)  She then argued under a Step Four standard that the sedentary RFC articulated by the ALJ was "contrary to the medical evidence in the record documenting her severe physical and psychological problems."  (*Id.* at p. 15.)  She later cited to precedent relating to a finding that a "combination of impairments (plural) did not meet or equal the Listings," but went on to argue "the ALJ clearly did not consider the effect of the

36

combination of [her] impairments and whether they supported the ALJ's decision finding that she was capable of performing work on a sustained and full time basis."  (*Id.* at p. 19.)

In addition to apparently conflating her arguments under Steps Three and Four of the sequential analysis, Ms. Weir also neglects to offer clearly articulated arguments as to what specific error(s) the ALJ committed with respect to her combination of impairments.  The general inadequacies of her arguments under the listings have already been addressed and will not be revisited here, and her references to a combination of impairments do not cure the basic deficiencies of her listings arguments for the reasons previously stated.

Courts in the Sixth Circuit have held that a "'finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments,' so long as the ALJ has 'conducted sufficient analyses of each of the claimants' impairments after carefully considering the entire record.'"  *Malave v. Saul*, No. 1:18-CV-2747, 2019 WL 5552614, at *13 (N.D. Ohio Oct. 22, 2019), *report and recommendation adopted*, No. 1:18CV2747, 2019 WL 5552613 (N.D. Ohio Oct. 28, 2019) (quoting *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002) (citing *Gooch v. Sec'y of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)).)  Here, the ALJ stated that Ms. Weir "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" (Tr. 15) and provided a detailed analysis of the impairments in his Step Four discussion of the RFC (Tr. 17-18).  Ms. Weir does not argue or demonstrate that the ALJ failed to consider specific material evidence, and the undersigned's review of the record did not reveal any such deficiency.  Thus, Ms. Weir has failed to establish

that the ALJ committed harmful error in finding that her combination of impairments did not meet or medically equal any listing.

The same general analysis applies to Ms. Weir's Step Four arguments. Although she asserts that the ALJ's sedentary RFC finding was "contrary to the evidence in the record documenting her severe physical and psychological problems" (ECF Doc. 9 p. 15), she does not identify any records that the ALJ mischaracterized or failed to consider in his RFC analysis. Instead, she cites to evidence that was largely addressed in the ALJ's Step Four analysis and asserts that the ALJ should have weighed the evidence differently to reach a different result.

In the context of this argument, Ms. Weir highlights her psychiatric consultative examination and self-reported activities of daily living – including that she had an email account, managed her finances, performed some household chores, talked to others on the phone, and liked to watch television – arguing that her activities "did not support the ALJ's finding that [she] only had none or moderate limitations in her ability to function." (*Id.* at p. 16 (citing Tr. 15).) More specifically, she argues that the ALJ's reference to her self-reported two-hour attention span would preclude substantial gainful activity on a sustained and full-time basis. (*Id.* at pp. 16-17; *see* Tr. 215.) As in prior sections, she does not identify material evidence that that was excluded from consideration or mischaracterized by the ALJ, instead rehashing factual information from the records that is consistent with the ALJ's own discussion of the evidence. Contrary to Ms. Weir's arguments, none of this evidence precludes a finding that the ALJ's RFC determination as to her combination of impairments was supported by substantial evidence.

It is well-established that "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545. Thus, even if

38

substantial evidence supports Ms. Weir's weighing of the evidence, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406. Because Ms. Weir has not met her burden to demonstrate that the ALJ failed to consider the combined effects of her impairments, or that his decision lacked the support of substantial evidence, this argument must fail.

**D.     Third Assignment of Error: Whether ALJ Violated SSR 16-3P**

Ms. Weir also asserts that "the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether [her] testimony was credible." (ECF Doc. 9 pp. 21-22.) She argues that "the ALJ failed to articulate any rationale beyond the boilerplate paragraph finding that [her] statements were inconsistent with the medical evidence," and asserts this is both inadequate and inaccurate. (*Id*.) She further asserts that while "the ALJ acknowledged that Weir had reported fatigue and pain," he "failed to properly consider this pain" and failed to consider that her symptoms fluctuated. (ECF Doc. 9 pp. 18-19.) The Commissioner responds that the ALJ properly relied on the State agency reviewing physicians' prior administrative medical findings and the clinical evidence in evaluating Ms. Weir's reported symptoms and making the RFC determination. (ECF Doc. 11-1 pp. 22-25.)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016) (republished as 82 Fed. Reg.

49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions to regulations effective March 27, 2017)) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  SSR 16-3p, 82 Fed. Reg. 49462, 49463.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id*.  Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered.  *Id*. at 14170 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness"), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law using the old terminology.  *See, e.g., Alexander*, 2021 WL 4459700, *14, n. 11; *Young-Roach v. Soc. Sec. Adm.*, No. 1:20-cv-1853, 2021 WL 4553128, *10 (N.D.

40

Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at *5.  These cases remain relevant because SSR 16-3p did not change the "two-step process" that an ALJ utilizes "when assessing the limiting effects of an individual's symptoms." *Martin v. Kijakzi*, No. 1:20-CV-117, 2021 WL 4066985, *5 (E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, No. 1:20-cv-138, 2021 WL 4145626, *5 (W.D. Mich. Sept. 13, 2021) (explaining SSR 16-3p did not change "[t]he longstanding two-part analysis for evaluating symptoms.") (internal citations omitted).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  When the alleged symptom is pain, the ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994).  Factors relevant to symptoms such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  There is no dispute that the first step is met in this case, so the discussion herein will focus on the second step.

Contrary to Ms. Weir's assertion that he "failed to consider Weir's testimony that her most significant problems were muscle weakness, leg weakness, and the falling" (ECF Doc. 9 p.

22), the ALJ acknowledged her testimony that she fell once a week, and was limited by weakness and pain caused by MS and arthritis.  He summarized her reported symptoms as follows:

> In written reports and testimony, the claimant alleged an inability to sustain full-time work due to a combination of physical and mental symptoms. Multiple Sclerosis and inflammatory arthritis cause burning pain, tremors, spasms, weakness and pain and limit exertional capacity. Pain and spasms occur every day, all day. The claimant sleeps with ice packs on her legs. Symptoms affect all extremities. The claimant falls about once per week. She uses a cane, but it is not formally prescribed. Use of her hands is limited by tremors that come and go. The claimant sometimes has trouble with buttoning and cooking. She can lift about a gallon of milk. Sitting, standing, walking and grasping are all limited. Mental impairments limit concentration. The claimant only had side effects of medication one time. She got hot, dizzy, and felt faint after a medication injection for about ten minutes.

(Tr. 17.)

The ALJ went on to explain that he did not find Ms. Weir's testimony regarding the intensity, persistence and limiting effects of her symptoms to be entirely consistent with the medical record evidence, including: (1) an April 2018 EMG testing that was normal in the lower extremities (Tr. 17 (citing Tr. 258)); (2) an August 2018 cervical MRI that showed no lesions and normal ER (*id*. (citing Tr. 275)); (3) physical examination findings from both neurological and rheumatological specialists reflecting a normal or intact gait (*id*. (citing Tr. 267, 272, 277, 282, 308, 312, 316, 320)); (4) neurological examination findings showing full muscle strength and tone (*id*. (citing Tr. 272, 282, 395, 400, 467)); and (5) neurological records showing no or minor falls and no exacerbations of MS (*id*. (citing Tr. 393, 467)).  In addition, as the ALJ noted, Ms. Weir discontinued rheumatological care in September 2018, and her last neurological treatment record was in February 2020.  (Tr. 17, 474.)

With regard to the location, duration, frequency, and intensity of Ms. Weir's reported pain, the ALJ acknowledged her physical complaints and pain allegations, but noted largely

normal physical examination findings and some benefit from medication in treating her MS and arthritis symptoms.  (Tr. 16-19.)  The ALJ also directly addressed Ms. Weir's reported need for a cane, noting that the record did not show it was prescribed, and that her gait was normal in several examinations with symptoms appearing to wax and wane.  (Tr. 19.)

Ms. Weir correctly notes that there was a nine-month period in which her gait became unsteady, and she reported falls.  In June 2019, her neurologist noted full motor strength and normal tone, but an insecure gait and station.  (Tr. 262.)  He increased her dosage of baclofen, added gabapentin, and advised her to return in three months.  (*Id.*)  She returned in October 2019, reporting she used a cane outside the home, but was no longer falling.  (Tr. 393.)  Her neurologist again noted full motor strength, normal tone, and insecure gait and station, also observing that she could not tandem walk.  (Tr. 395.)  At her final neurological appointment, a new neurologist noted she was using a cane with "[s]ome occasional unsteadiness" and "minor falls" as recent as 1.5 weeks prior.  (Tr. 467.)  On examination, he noted she was steady with a cane, with full motor strength and normal tone.  (Tr. 469.)  Her final treatment record, from an April 2020 primary care visit, notes she reported "she has been feeling well."  (Tr. 474.)  She reported "muscle weakness, tingling or numbness," but denied "joint pain, joint swelling, [or] muscle pain," and denied "loss of balance."  (Tr. 476.)  On examination, Dr. Nam's only abnormal finding was obesity.  (*Id.*)  He continued her medications and advised her to engage in regular aerobic exercise for 30 minutes five days a week.  (Tr. 478.)

All of this provides specific evidentiary support for the ALJ's determination that Ms. Weir was limited to sedentary work with frequent fingering and feeling, a greater limitation than the light RFC recommended by the State agency reviewing physicians.  (Tr. 19.)  While the ALJ explained that he found the opinions of the State agency reviewing physicians "persuasive and

43

supportable," he had adopted a more RFC restrictive limitation to "standing/walking … no more than two hours in a normal workday" based on "the effects of obesity, pain, and fatigue" reported by Ms. Weir.  (*Id.*)

It is the job of the ALJ, and not the reviewing court, to evaluate a claimant's subjective complaints.  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) ("Our role is not to . . . examine the credibility of the claimant's testimony."); *Brainard v. Sec'y of HHS*, 889 F.2d 679, 681 (6th Cir. 1989) ("We do not . . . make credibility determinations . . ."). Here, the ALJ's evaluation is supported by substantial evidence and is therefore entitled to deference from this court.

To the extent Ms. Weir contends that sedentary RFC is inadequate to address the functional limitations caused by her impairments, she has not met her burden to demonstrate that the ALJ's finding lacked the support of substantial evidence.  Certainly, as the ALJ noted, no medical source recommended greater limitations.  (Tr. 20.)  Ultimately, the undersigned finds the RFC limitations applied by the ALJ were consistent with the evidence and adequately supported by the decision.  While Ms. Weir identifies evidence that could support greater limitations, it is sufficient in this case that "substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For all of the reasons set forth above, the undersigned finds Ms. Weir has not met her burden to demonstrate that the ALJ failed to properly evaluate her testimony or lacked substantial evidence to support his finding that she could perform sedentary work that required frequent fingering and feeling with both upper extremities.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


/s/*Amanda M. Knapp*

July 6, 2022

_____

AMANDA M. KNAPP
United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).